IN THE COURT OF APPEALS OF TENNESSEE
AT JACKSON
August 30, 2001 Session

## SHIRLEY PEGUES, ET UX. v. DR. LESTER R. GRAVES, JR., ET AL.

A Direct Appeal from the Circuit Court for Shelby County
No. 52737 T.D.      The Honorable Kay S. Robilio, Judge

No. W2000-02831-COA-R3-CV - Filed November 14, 2001

Plaintiffs, husband and wife, sued physician when wife became pregnant after physician had performed a pregnancy avoidance procedure and allegedly guaranteed the results thereof. Defendant moved for a directed verdict which the trial court granted, but plaintiffs contend that it was granted after plaintiffs took a nonsuit. Plaintiffs appeal. We reverse.

**Tenn.R.App.P. 3; Appeal as of Right; Judgment of the Circuit Court Reversed and Remanded**

W. FRANK CRAWFORD, P.J., W.S., delivered the opinion of the court, in which ALAN E. HIGHERS, J. and DAVID R. FARMER, J., joined.

Fred M. Ridolphi, Jr., Memphis, For Appellants, Shirley and Curtis Pegues

William H. Haltom, Jr., Memphis, For Appellees, Dr. Lester R. Graves, Jr.,and Drs. Graves, Sanford, Cox & Aycock, P.C.

**OPINION**

Plaintiffs, Shirley Pegues and husband, Curtis Pegues, filed a complaint against defendants, Dr. Lester Graves, Jr., Drs. Graves, Sanford, Cox and Adcock, P.C. The complaint alleges claims for professional negligence and for breach of contract, and by amendment to the complaint, an allegation of fraudulent misrepresentation in that Dr. Graves, acting for the P.C., allegedly represented to the plaintiffs that the procedure he would perform would be 100 percent effective. The complaint alleges that Mrs. Pegues became pregnant subsequent to the procedure, and plaintiffs incurred substantial expenses and other damages as a result thereof, all of which was caused directly and proximately by the actions of Dr. Graves.

Defendants' answer denied the material allegations of the complaint and joins issue thereon. The answer further avers that the defendants complied with the recognized standard of care for their specialty in this community, and that they did not cause any damages to the plaintiffs.

Summary judgment was granted by the trial court on all plaintiffs' causes of action except for the cause of action for fraudulent misrepresentation. A jury trial was commenced on this action and at the close of plaintiffs' proof, the trial court granted defendants a directed verdict.

Plaintiffs have appealed and present two issues for review as stated in their brief:

> 1. Did the Trial Court err in not allowing Plaintiffs to take a voluntary dismissal pursuant to Rule 41 T.R.C.P. which was announced prior to the Court's final ruling on Defendants' Motion for Directed Verdict.

> 2. Did the Trial Court err in granting Defendants' Motion for Directed Verdict by ruling that Plaintiffs' proof failed to establish that damages sustained were causally connected to the Defendants' alleged wrongful conduct.

In plaintiffs' first issue for review, they assert that the trial court erred in not allowing them to take a voluntary dismissal pursuant to Tenn.R.Civ.P. 41.01 (2001), which provides in pertinent part:

> [T]he plaintiff shall have the right to take a voluntary nonsuit to dismiss an action without prejudice . . . by an oral notice of dismissal made in open court during the trial of a cause; or in jury trials at any time before the jury retires to consider its verdict and prior to the ruling of the court sustaining a motion for a directed verdict.

Plaintiffs assert that they announced a voluntary dismissal prior to the trial court ruling on defendants' motion for a directed verdict. To make this determination, we must review the transcript of the proceedings.

At the conclusion of plaintiffs' proof, defendants moved for a directed verdict based upon lack of any causation testimony. Extended colloquy was conducted between the court and the two lawyers, the pertinent part of which we quote:

> THE COURT: Now, Mr. Ridolphi?

> MR. RIDOLPHI: Yes, ma'am.

THE COURT: The aspect that I'm looking at is as a result of the concealment of the fact, the plaintiff sustained damage. And what Mr. Haltom is saying is that the proximate cause that's always necessary to show that the plaintiff sustained damage is not available here. And I hadn't thought about that aspect of it, if she could just as easily or perhaps more easily gotten pregnant with the IUD. The fact that she would have changed her behavior, of what significance could that be?

MR. RIDOLPHI: Ms. Pegues went in to have – what she testified to– That's where we are in this case.

THE COURT: I know.

MR. RIDOLPHI: To have a 100 percent fail safe procedure.

THE COURT: But it wasn't available. It wasn't available. All the testimony is is that there's no such thing that exists.

MR. RIDOLPHI: All right.

THE COURT: So even though that was her goal, that wasn't what she could hope to get no matter what –

MR. RIDOLPHI: She didn't know that. That's the whole point. She said, I didn't know that. That's the whole thing. She relied upon the fact that he said it was 100 percent. That's the whole point that this....

MR. RIDOLPHI: Your honor, she changed her pregnancy avoidance procedure based upon his reliance.

THE COURT: Exactly right. And if you could show that that made any difference at all, you'd be in the ballpark, but you –

MR. RIDOLPHI: How can I show – how can I show – how can I show that if she had kept using the IUD –

THE COURT: Because it's not true, and so you can't show it. And that's why we're not getting anywhere it looks like to me. You can't show that. You can't. It's Mr. Haltom's unassailable reasoning on this. It's got to have consequence. It has to make a difference what he said. There has to be a result. In other words, it had to make some kind of difference, and according to the proof, it just doesn't make

any difference. She could just as well have gotten pregnant if she hadn't had the procedure and was using the IUD. And that's the proof before the Court, and there's no other proof before the Court. And that being so –

MR. RIDOLPHI: Then why wouldn't Dr. Graves say, look, lady, keep with the IUD. It doesn't make any difference. There's nothing I can do.

THE COURT: Because he believed that the procedure, I'm sure, was – had some value. And the proof is that the one he did was – or maybe we don't have any proof on that. But at any rate, the only proof before the Court is that there were several births born according to these surveys when this particular procedure that Dr. Graves did was done. And there was further proof that – I mean, I think if you want to get to where you want to be, you'd have to have somebody take the stand and say that – medical proof that a woman using an IUD over a period of time – whatever time Mrs. Pegues was using her IUD – and was finding that it worked for her and that she had no pregnancies was a better insurance to her than having the operation that Dr. Graves performed. And there's no evidence to sustain that.

MR. RIDOLPHI: The other side of the coin is I don't think I need that, because that's what in fact he told her according to her. It's 100 percent. That's what he told her.

THE COURT: Well, suppose he told her that. It's still – even if he told her that, it's not true, and it wouldn't have any consequence. Suppose he told her that –

MR. RIDOLPHI: That's up to this jury to decide what was told.

MR. HALTOM: Your Honor --

THE COURT: I'm assuming arguendo that everything the plaintiff says is true. I'm assuming that what she says is true. But Mr. Haltom's argument is it doesn't make any difference if he did say that, because it wouldn't matter because she could still get pregnant whether she had the IUD or didn't use the I – you know, use the procedure that Dr. Graves –

MR. RIDOLPHI: That's what fraud is all about. There's a false statement. The person who makes the statement knows –

THE COURT: You've got to have damages.

MR. RIDOLPHI: I understand that.

THE COURT: You've got to have damages.

MR. RIDOLPHI: But there has to be reliance upon it, and there has to be based upon the reliance some damage, and she got pregnant.

MR. HALTOM: There has to be causation.

THE COURT: There's got to be causation. I agree.

MR. RIDOLPHI: She went on the basis that that was 100 percent.

THE COURT: Well, that's not scientific. That's not scientific. Whatever basis she went on, that's not scientific. And the fact that she – let's say arguendo that everything Ms. Pegues says is true. Suppose the doctor lied to her and says it's 100 percent, and it wasn't. It just doesn't make any difference, because whether she's on the IUD or on something else, she still could have gotten pregnant, and no one can say any differently. Nothing –

MR. RIDOLPHI: That's not relevant –

THE COURT: You didn't produce a witness who could say anything –

MR. RIDOLPHI: That's not the point. The point in a misrepresentation fraud case is the misrepresentation, the knowledge it's not true, the reliance upon the other party, the grounds, the relationship to allow the party to rely upon it. The party relies upon it, changes her course of action, and damages follow. And damages follow here when she changed her course of action.

THE COURT: You're wrong.

MR. HALTOM: There's no causation.

THE COURT: There's no causation. There's nothing to show that it would have made any difference at all. In fact, I think Ms. Pegues testified she was having problems with the IUD anyway, and she was going to have to change. Now, whatever she might have changed to,

no jury can be made to speculate that if she had changed to some other birth control that there would have been less of a chance, and there's no proof to that effect. Even if it – I mean, even suppose that someone would say, yes, you know, given that the IUD was given Ms. Pegues problems, she could have switched to x. And x would have had less of a failure rate than the procedure that Dr. Graves performed. But that's not in the proof. So I respectfully disagree with you, Mr. Ridolphi, and it gives me no pleasure to grant a directed verdict.

MR. RIDOLPHI: I understand that. May I say one more thing?

THE COURT: Yes.

MR. RIDOLPHI: The procedure was result oriented, right? And the result was not to become pregnant.

THE COURT: And she didn't become pregnant for several years. If she had been on the IUD, maybe she would have become pregnant earlier. Who knows? I mean, maybe she would have become pregnant, and maybe, maybe, maybe. But, I mean, that's speculation, and there is no speculation. And it is only in the proof that no matter what birth control method you use you can become pregnant. So while –

MR. RIDOLPHI: But that's not the issue.

THE COURT: Mr. Haltom would not be free of damages and would not get his whole directed verdict at this point in time if there had been proof of any medical expenses incurred for the failed pregnancy avoidance procedure. You would still get that, but there's no proof on this.

MR. RIDOLPHI: May I –

THE COURT: Take exception.

MR. RIDOLPHI: No. Can I say something?

THE COURT: Yes, anything else, you say it. I want you to say it. I don't know what it can be, but have a go at it.

MR. RIDOLPHI: Your Honor, there are certain givens in this case, there is no pregnancy. Everybody admits that. And the bottom line is there was a pregnancy. You don't have to have the causation in a fraud case that you're talking about. The damage is that she became pregnant. When Dr. Graves said you won't become pregnant, that's the damage. Just because she may have gotten pregnant if she stayed with the IUD and none of them are 100 percent doesn't make any difference. She has the right to have the full knowledge. And the full knowledge according to her proof is Dr. Graves says it's 100 percent you won't get pregnant, and boom, she got pregnant. That is the damages. That is the damages.

MR. HALTOM: You can't –

MR. RIDOLPHI: Whether or not they're all – whether or not they all have failure rates, he didn't tell her that. But whether or not they're all – she just – I mean, she got pregnant because of the procedure he performed, and he said it was going to be 100 percent.

THE COURT: No. She got pregnant because she had relations with her husband, and as it happened, that procedure didn't work for her. But there is nothing in the evidence that would indicate in any way that if she were using anything else or anything else had been performed she still might have gotten pregnant. And I respect – I want you to say everything you want to say and put it on the record or appeal, of course. But, I mean, I'm stuck with my own thought processes, and I think Mr. Haltom's position is unassailable myself. I –

MR. RIDOLPHI: May I have a moment with my clients, Your Honor?

MR. HALTOM: I think Your Honor has ruled. I thought we had a ruling.

MR. RIDOLPHI: May I have a moment with my clients?

THE COURT: Yes.

MR. RIDOLPHI: Your Honor, based upon your comments, we're going to take a voluntary nonsuit.

MR. HALTOM: Your Honor, I thought you had ruled. Mr. Ridolphi played a little gotcha game with me on six eleven. I don't like to practice law this way, but I thought Your Honor had ruled and granted on a motion for directed verdict.

THE COURT: I said I agreed with Mr. Haltom. I also said I wanted you to have full opportunity for you to discuss things with me before, I guess, I said it formally.

MR. RIDOLPHI: Yes, ma'am, that's why I wanted to talk to my clients.

MR. HALTOM: Well, I thought Your Honor had ruled. I didn't pack up quickly enough, I guess, Your Honor. But I thought Your Honor had ruled. Let me say this –

THE COURT: I was – truthfully, Mr. Ridolphi, I was doing that as a courtesy to you, because I don't like to cut lawyers off.

MR. RIDOLPHI: Well, I am moving for – I am taking a voluntary nonsuit at this point.

MR. HALTOM: My position is that Your Honor ruled, and you invited him to say anything else he wanted to say on the record or appeal. Your words were, Mr. Ridolphi, you can appeal. And I didn't – I thought that we had a ruling at that time. I respectfully submit it's too late for a voluntary nonsuit, that we need to enter an order granting a directed verdict. That's all I'll say about it, Your Honor.

MR. RIDOLPHI: I think until the Court absolutely brings the gavel down, and I submit the gavel hadn't been brought down – the Court had given me every indication what she was going to do, and that's why I asked –

THE COURT: I was merely extending a courtesy to you simply – it was a pure courtesy to just simply allow you to ventilate. And that's the truth of it, Mr. Ridolphi. Because I don't ever want to be seen as being disrespectful. And you looked very conflicted and frustrated, and I wanted you to have the opportunity to ventilate. But I had told Mr. Haltom that I agreed with Mr. Haltom, that his reasoning was unassailable and that you could appeal. I mean, we can read my words back.

MR. HALTOM: I think we had a ruling.

THE COURT: I never said formally, it's true, Mr. Haltom your motion is granted. That much is true. I didn't say that.

MR. HALTOM: Well, again, Your Honor, I thought we had a ruling, and the invitation was for him to appeal. And I'll be happy to prepare an order granting the motion, if that's Your Honor – if that's where we are.

THE COURT: This is really awkward for me.

MR. HALTOM: I thought Your Honor had made a ruling and just was giving Mr. Ridolphi any –

THE COURT: Well, certainly in my mind I had made a ruling.

MR. HALTOM: That's what counts, Your Honor.

THE COURT: I wanted you to just have the opportunity to say what you wanted to say. You still have the opportunity to appeal, which is what I sad you had the opportunity to do, Mr. Ridolphi.

MR. RIDOLPHI: Your Honor, you have put me in a position that I have to weigh my options. That's why I asked to talk to my clients, to see what they wanted to do. I explained the options to them, that they could either dismiss the case voluntarily or let the Court rule and have an order entered and appeal it. And that's why I asked for that time.

THE COURT: And I have to be honest. Mr. Ridolphi, my feeling is I had ruled. And I [sic] was simply out of courtesy giving you an opportunity, because I didn't want you to simply feel closed off from saying anything, because you looked so frustrated.

MR. RIDOLPHI: I am frustrated, Your Honor.

THE COURT: Well, of course you are. And do you think the Court is not?

MR. RIDOLPHI: I don't know.

THE COURT: Not perhaps equally frustrated, but surely frustrated.

Tennessee courts have long held that it is error for a trial court to deny the right of nonsuit moved for before a definite and final action by the judge on a motion for a directed verdict. ***See Brackin v. McGannon***, 137 Tenn. 207, 192 S.W. 922 (Tenn. 1916); ***Darby v. Pidgeon Thomas Iron Co.,*** 144 Tenn. 298, 232 S.W.2d 75 (Tenn. 1921).

In ***Graves v. Union Ry. Co.***, 177 Tenn. 699, 152 S.W.2d 1026 (1941), the Court again followed the long-established rule stating:

> It is the general rule that a voluntary dismissal, leaving intact the right to commence a new action, must be made, at the latest, before final decision of the case or question, before a decree adjudging the rights of the parties.
>
> We are of opinion that after a trial judge has definitely sustained a motion for a directed verdict, as distinguished from merely intimating or suggesting that such will be his action, - a practice commonly taken as an invitation for further argument, or sometimes, as a suggestion of an opportunity for the taking of a nonsuit, – a motion for a nonsuit comes too late.

152 S.W.2d at 1029.

In ***Bellisomi v. Kenney***, 185 Tenn. 551, 206 S.W.2d 787 (Tenn. 1947), the trial court sustained a motion for a nonsuit at the conclusion of plaintiff's evidence after the motion for a directed verdict had been made by the defendant. The Court of Appeals affirmed the trial court and on petition for certiorari to the Supreme Court, the Supreme Court denied the petition and adopted the opinion of the Court of Appeals. The opinion points out that the trial court sustained the motion for a voluntary nonsuit because the trial court stated: "I have not definitely and finally sustained your motion for a directed verdict." 206 S.W.2d at 788. The opinion states that the question is controlled by ***Graves***, as quoted in this opinion above, and explains the task of the trial judge when faced with a motion for a nonsuit after a motion for a directed verdict is made:

> ["]The judge is thereby left a sound discretion to be exercised according to what he thinks is required of a tribunal engaged primarily in dispensing justice. If he thinks the purpose can best be served by cutting off the right to a non-suit, then, as Judge Henderson points out, he can announce his formal decision immediately after the motion for a directed verdict and argument thereon, if any, and then, if he choose, give the reasons for his decision.
>
> "Upon the other hand, if he thinks that justice requires, he can leave that right temporarily intact by first discussing the issues of law and fact, withholding definite action on the motion until he has

concluded, or until he goes through the usual formality of instructing the jury as to the verdict they shall return, all in the expectation that the plaintiff will anticipate the decision and take advantage of the opportunity thus afforded him if he care to do so. ***Graves v. Union Ry. Co., supra***

\*        \*        \*

"To sum up, the judge can cut off the right to a non-suit by a definite announcement of his decision, either before or after a discussion of his reasons, . . . But in either or any event, it is the definite and formal announcement of the decision on the motion for a directed verdict, whenever made, which ends the right to a non-suit, . . . ***Graves v Union Ry. Co., supra***.

206 S.W.2d at 789.

In ***Phipps v. Carmichael***, 376 S.W.2d 499 (Tenn. Ct. App. 1963), this Court considered the same issue. In ***Phipps***, the opinion quotes the exchange between the trial judge and attorney both preceding and following the motion for a voluntary nonsuit:

THE COURT: Mr. Gerber, I don't believe we have a case for the jury.

MR. GERBER: Under the circumstances, I would like to take a voluntary non-suit at this time.

MR. MCDONNELL: If your Honor please, this has happened, I am sure, on many occasions. As I understand the rule, the plaintiff is allowed to take a non-suit up until the Court has announced its ruling. It occurs to me that the Court has announced it ruling.

THE COURT: I have indicated very plainly what the ruling will be, but I have not gotten around to stating that I will sustain the motion.

MR. MCDONNELL: All right, sir.

THE COURT: So, I am going to allow him to enter the non-suit, Mr. McDonnell.

376 S.W.2d at 500-01. This Court held that the trial court did not err in allowing the voluntary nonsuit under the facts presented.

In reviewing the colloquy between the court and lawyers in the instant case, it is apparent that the trial judge indicated that she was disposed to grant the defendants' motion for a directed verdict. The judge states that in her mind she had a ruling, but the record does not reflect any such language prior to plaintiffs' motion for a voluntary dismissal granting a directed verdict. The record quite explicitly reflects that the court stated in this regard: "I never said formally, its true, Mr. Haltom, your motion is granted. That much is true. I didn't say that."

We also find it quite significant that in the course of the colloquy, plaintiffs' attorney asked permission of the court to confer with his clients. Defendants' counsel then interposed to the court that he thought the court had ruled, and there was no response from the trial judge. Again plaintiffs' counsel asked permission to speak with his clients, and the trial judge granted the request. It appears to this Court that at this juncture, the trial court should reasonably assume that the lawyer would at least explain to his clients the status of the case and any alternative choices available. If there were no alternative choices left, the trial judge should have voiced this to counsel at that time.

Under this record and the principles stated in the heretofore cited cases, we find that the trial judge had not directly ruled on the motion for a directed verdict prior to plaintiffs' motion for a voluntary dismissal. Accordingly, the trial court erred in denying plaintiffs' right to take a voluntary dismissal pursuant to Tenn.R.Civ.P. 41.01.

In view of our decision, we pretermit consideration of the second issue.

The judgment of the trial court is reversed, and this case is remanded to the trial court for entry of an order of voluntary dismissal pursuant to Tenn.R.Civ.P. 41.01. Costs of the appeal are assessed against the appellees, Dr. Lester R. Graves, Jr., Drs. Graves, Sanford, Cox & Aycock, P.C.

_____
W. FRANK CRAWFORD, PRESIDING JUDGE, W.S.